[972 NYS2d 25]

In the Matter of Kevin McK., Respondent, v Elizabeth A.E., Appellant.

First Department, October 1, 2013

**APPEARANCES OF COUNSEL**

*O'Melveny & Myers LLP*, New York City (*Brad M. Elias* and *Andrew J. Frackman* of counsel), for appellant.

*Kevin McKeown*, respondent pro se.

*Andrew J. Baer*, New York City, Attorney for the Child.

**OPINION OF THE COURT**

Saxe, J.

In this relocation case, where respondent mother, Elizabeth E., seeks permission to move with the parties' child to Oxford, Mississippi, we are once again confronted with the problem of balancing a child's need for the ongoing presence of both parents in his daily life, with the custodial parent's proven inability to support herself and the child beyond the subsistence level here in New York.

Facts

The parties never married, but were intimately involved for 10 years, during which time their son, Lucas, was born, on January 6, 2003. The father, Kevin McK., moved into the mother's apartment a few months prior to the child's birth, and moved out in November 2007, when the child was about 4¹/₂ years old. The mother filed a custody petition in December 2007, and was awarded temporary custody on January 8, 2008; the father filed a custody petition shortly thereafter. Later that year, the mother filed a second petition, seeking to modify the temporary custody order to permit her to relocate with the child to Oxford, Mississippi.

Trial on the issues of custody and relocation commenced on or about November 18, 2009, and was conducted on 13 days over the course of 2¹/₂ years. The mother testified that from approximately 1989 through 2007, her primary source of income was from her employment at the Claremont Riding Academy as a horseback riding instructor, earning approximately $20 per hour, plus tips and commissions. Between 2003 and 2007, she earned approximately $20,000 per year from her work at Claremont, sometimes closer to $30,000. During that period, she also earned approximately $5,000 from a book she published, $2,400 from teaching writing classes at the Jewish Community Center (JCC), in Manhattan, and approximately $5,000 per summer teaching at a riding camp in Mississippi.

However, in April 2007, Claremont closed, and the mother lost her job. Although she sought employment as a riding instructor in the New York metropolitan area, she was only able to find work one day per week, at a stable in Westchester, with a round-trip commute of approximately four hours; she found that the cost of the commute exceeded her earnings from the job. She was unsuccessful in her attempts to find other riding jobs or other writing assignments. She still taught a small number of writing classes at the JCC, earning $4,500 between 2007 and 2011, and found some small editing jobs from which she earned less than $1,000 in total.

From the time Claremont closed in April 2007 until November 2007, and again in 2009 and 2010, the mother collected $300 per week in unemployment benefits, but she has not been eligible for those benefits since June 2010. In addition, between June 2010 and June 2011, when the mother was entitled to $732 per month in child support from the father, payments were almost always late, and several payments were missed

entirely between November 2010 and February or March 2011. Support arrears in excess of $6,000 had accrued by June 2011, which the father paid off after a one year delay, only after the mother filed a violation petition. He has not made any further support payments since then.

Due to the missed child support payments and increases in her rent since 2007, the mother testified that she was barely able to make ends meet, so that to cover her expenses, she had borrowed $10,000 from a friend, as well as $1,800 from the Author's League Fund, and some smaller amounts from her parents, as well as drawing down on her savings, which decreased from approximately $25,000 to $10,000. Essentially, she has supported herself and the parties' child on a combination of her meager earnings, irregular child support payments, unemployment benefits, food stamps, loans from friends and family, and by depleting her savings.

The mother's tax returns were admitted into evidence. According to the returns, in 2007, she earned approximately $31,486; in 2008, approximately $8,074; in 2009, approximately $16,000; and in 2010, approximately $13,000.

The mother established that two stables in Oxford, Mississippi, have offered her year-round employment as a horse trainer and riding instructor. She estimated that, were she to relocate to Mississippi, her expenses would be reduced by approximately 75%, and the combined income from those jobs would exceed $2,000 per month. Testimony from her own mother, the child's grandmother, who lives in Oxford, Mississippi, reflected that if the mother and child are permitted to relocate, the child will have the benefit of a close relationship with his grandparents and cousins as well as other children his age with whom he has developed friendships during previous summers spent in Mississippi.

Oxford, Mississippi was described as a university town, a "safe, wonderful community of loving, caring people," with an exceptional public school, which is more highly rated than his current school in Manhattan. The child would have the opportunity to play in the yard, ride the tractors, and help with the horses. The mother would have emotional and financial support and would no longer have to worry about paying the bills, and an apartment over the maternal grandparents' garage would be made available to the father for free any time he wanted to visit the child.

The court-appointed forensic psychologist, Dr. N.G. Berrill of the New York Center for Neuropsychology and Forensic

Behavioral Science, testified that if the child were to move to Mississippi due to financial circumstances, he would be able to make the necessary adjustment and, provided that ample contact was permitted between the child and the father, such a move would not be damaging to the child. Dr. Berrill did not believe that the mother was moving to Mississippi to interfere with the child's relationship with the father. To the contrary, she seemed to appreciate that the child has a positive relationship with the father. Dr. Berrill further noted that he found no evidence that the mother was "badmouthing" the father or attempting to alienate him from the child.

The father's own testimony cogently demonstrated that the mother would not be able to rely on him for steady and current payments of support. Although he claimed to have filed income tax returns, he could not recall whether he had filed tax returns in the years 2006, 2007 and 2008, and testified that he had "no idea" what income he had reported, and that he "would not be able even to begin" to put together a list of his "various sources of income" that "varie[d] week to week." Nor could he provide an income range for his earned income. While he does not have regular employment, he stated that he was starting a newspaper called the New York Bulletin, which had purportedly received $200,000 in funding in May 2011, which funding he used to satisfy his debts to the IRS and other people.

He refused to estimate his average monthly expenses. He asserted that he pays his rent by bartering personal services. He did not provide a lease for the apartment in which he was living in 2010, but testified that he was responsible for rent of $3,200 per month, although on cross-examination it was revealed that he had reported to the Support Magistrate that his rent was $1,000 per month.

Although the father claimed to be current on his child support obligations, a printout admitted into evidence indicated that as of January 2012 he was in arrears in the amount of $2,196. His assertions that he would receive a large inheritance in the future from which he could pay what was owed were shown to be inaccurate.

Despite these clear indications of the father's inability or unwillingness to regularly make the required child support payments, the Attorney for the Child took the position that the mother's relocation petition should be denied. He disbelieved her assertion that her financial situation made the relocation necessary; in his view, she failed to establish that she could not

find remunerative employment in New York, and failed to sufficiently substantiate her claims regarding available employment for her in Mississippi. Moreover, he argued that the evidence failed to establish that the mother was in dire need and distress, as she had successfully paid for her and the child's expenses up to that point, and continued to have a balance of funds in her bank account.

The court conducted an in camera interview with the child, at which the Attorney for the Child was present.

Family Court Order

At the conclusion of the hearing, the Referee found that both parties were good parents and loving toward the child, and that the father's involvement in the child's life has contributed to the child being happy and well-adjusted, but concluded that it was in the child's best interests for the mother to have sole legal custody. However, the court denied the mother's petition for relocation on the ground that she had failed to prove by preponderance of the evidence that her financial circumstances require that she be permitted to move to Mississippi—a move that, according to the court and the father, would disrupt the very close and steady relationship between the father and child.

The court expressed doubts about the mother's credibility, both in regard to her finances and her assertions that she would attempt to work with the father regarding additional visitation if the child moved to Mississippi. Nor was the court convinced that the mother's financial situation was as dire as she claimed, citing her continued ability to pay her rent, maintain $10,000 in savings, keep a zero balance on her credit card, and provide for the child; it found that she had not been forthright in regards to her finances, and asserted the belief that the mother has other jobs or income that was not documented.

Discussion

■ We find that the Family Court's determination denying the mother's petition for relocation lacks a sound and substantial basis in the record, and, further, that the mother established by more than a preponderance of the evidence that relocation is in the best interests of the child, in that it will enhance the child's life both economically and emotionally.

"Where a custodial parent seeks to change her residence in a manner that would detrimentally affect the other parent's ability to enjoy frequent and regular contact with the child, the relocating party bears the burden of establishing that the

proposed move is nevertheless in the best interests of the child" (*Salichs v James*, 268 AD2d 168, 170 [1st Dept 2000]). The ultimate determination in any relocation petition is the best interests of the child, and to make that determination, the court considers any relevant factors, including the parents' respective reasons for moving and for opposing the move, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally, and educationally by the move, the quality of relationship between the custodial and noncustodial parent and the child, and the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent (*Matter of Tropea v Tropea*, 87 NY2d 727, 736, 740-741 [1996]).

Here, the primary factors on which we must focus are the mother's reasons and need for the move, whether the child's life would be enhanced by the move, the impact of the move on the child's relationship with the father and the difficulty of maintaining the father's central role in the child's life.

The mother's petition for relocation was primarily based on the claim that the child's life would be improved by the move, because she has been unable to support herself and the child beyond the subsistence level since she lost her job in 2007. We find that she established the truth of that claim with a showing well beyond a preponderance of the evidence. While a trial court's assessment of the evidence is entitled to deference, there is no sound or substantial basis in the record here for the Family Court's assessment of the mother's truthfulness regarding her earnings and her earning ability (*see Matter of Gloria S. v Richard B.*, 80 AD2d 72, 76 [2d Dept 1981]). The supposition that the mother could find, or actually did find, other remunerative employment was not only unsupported, but indeed was contradicted by her receipt of various public assistance benefits such as Medicaid and food stamps. In sharp contrast to the father's evasive testimony and evidence with regard to his finances, the mother made a forthright showing of exactly how she had supported herself and the child.

Admittedly, the mother here is not (yet) destitute. Her financial situation is certainly not as bleak as that of the mother in *Matter of Melissa Marie G. v John Christopher W.* (73 AD3d 658, 658 [1st Dept 2010]), where this Court affirmed the grant of the mother's application to relocate with the parties' child to a stable home near the mother's family in Florida, after she and the child had lived in a series of homeless shelters. However,

while the need to improve the mother's and child's economic situation was far more extreme in that case, we find that the present relocation application was prompted by a legitimate, pressing need for a secure economic situation. Not only do we reject the unsupported suggestion that the mother actually had other, hidden, means of support, but we observe that proof of economic necessity does not require the parent to wait until she has used up every last dollar of her savings before taking steps to ensure that she will be able to care for the child's future economic needs.

Where the proposed move will provide economic, emotional and educational benefits for the child, relocation may be appropriate even where it will disrupt the frequency of visits between the child and the noncustodial parent (see *Aziz v Aziz*, 8 AD3d 596, 597 [2d Dept 2004], *lv dismissed and denied* 7 NY3d 739 [2006]). Several factors in *Aziz* justified the wife's proposed relocation to Texas with the parties' child: she had "an extensive support network in Texas, which include[d] her parents, a brother, aunts, uncles, cousins, and a large Muslim community," "the child ha[d] a strong emotional bond with his maternal grandmother," and "[t]he lower cost of living in Texas for the wife [would] allow her to improve their lifestyle and save for the child's college education" (*id.*). Similarly, here, the proposed move to Mississippi will give the mother and child an extensive network of family support, and the child has strong emotional bonds with his maternal grandparents, whom he has visited in previous summers. The requested relocation will provide the benefits of living near, and having the financial and emotional support of, the child's maternal extended family, enabling the child to enjoy a comfortable life free of economic distress, among a loving and supportive extended family. That powerful consideration would be less weighty if the father were providing consistent, steady, and sufficient support to ensure the child's lifestyle at a level above subsistence; however, nothing in the record provides such assurance.

The present case stands in stark contrast with the facts in *Salichs v James* (268 AD2d 168 [1st Dept 2000]). There, this Court denied a mother's petition to relocate to Puerto Rico because she failed to prove that she had sought alternative work in New York, and in fact there was evidence that she could have successfully found another job here (*id.* at 172). Nor was there any claim in that case that the father could not be relied on to provide steady child support (*id.* at 170-171). Also, the father's

employment as an architect licensed in New York precluded him from having any substantial flexibility so as to allow for frequent visiting with the child in Puerto Rico (*id.* at 172). Another consideration in *Salichs* was the evidence that the mother had previously attempted to limit the time her daughter spent with the father, an impulse which could have been exacerbated by the move to Puerto Rico (*id.* at 173).

 Here, although the Family Court expressed serious concerns that the mother might interfere with the father's ability to maintain a meaningful relationship with the child, and believed the mother's affect and demeanor to support those concerns, nothing in the record establishes any actual interference by the mother. There is no history of the mother preventing or overtly interfering with father-child visits, or subtly interfering with the father-child relationship. On the contrary, the mother asserted in court that the father could come to Mississippi as often as he liked, and assured the court that he would be provided with transportation and accommodations. Additionally, the forensic psychologist did not believe that the mother sought to move to Mississippi to interfere with the child's relationship with the father, and observed that on the contrary, she seemed to appreciate that the child has a positive relationship with the father.

The important counterweight to the benefits of the relocation is the disruption that the relocation would necessarily cause in the close relationship between father and son. However, while the impact of the move on the quantity and quality of the child's future contact with the father is a central concern, it is not "the" central concern (*see Matter of Alaire K.G. v Anthony P.G.*, 86 AD3d 216, 219 [1st Dept 2011]). In *Matter of Alaire K.G.*, the mother's petition for relocation to California was granted, despite the disruption the move would cause in the strong and healthy relationship between the child and his father, because this Court found that the mother's move to California to live with her new husband would provide the child with more financial stability, and a better life, than that available with the father (86 AD3d at 220). Although this Court acknowledged that the child would see his father less frequently, it observed that extended holiday and weekend visits along with summer visits would allow for the father and child to maintain a strong relationship (*id.* at 221-222). Indeed, since the father was unemployed, this Court observed that a parallel move by the father could be feasible (*id.* at 220). A similar observation was

made in support of a grant of relocation in *Matter of Scialdo v Cook*, which allowed the mother to relocate to Florida with the parties' child, noting that "[a]lthough the relocation will affect the frequency of the father's visitation, we note that the court ordered that the father 'shall be entitled to visit his son in the state of Florida at any time that he is able to do so' " (53 AD3d 1090, 1092 [4th Dept 2008]).

Similarly, here, our grant of relocation is issued with the proviso that the father shall be allowed broad access to the child in Mississippi as well as a liberal visitation schedule for visits to New York, the specifics to be addressed by the Family Court on remand.

Lastly, we take judicial notice of certain court orders rendered subsequent to the preparation of the record on this appeal, since the contents of the orders are undisputed (*see Matter of Khatibi v Weill*, 8 AD3d 485, 485 [2d Dept 2004]). While not dispositive, those documents tend to indicate that the father will not likely be contributing financially to the care of the child, at least in the near future, which adds support to the conclusion that the relocation is in the child's best interests.

Accordingly, the order of the Family Court, New York County (Ivy I. Cook, Ref.), entered on or about April 10, 2012, which, after a hearing, to the extent appealed from, denied respondent mother's petition to relocate to Mississippi with the parties' child, should be reversed, on the law and the facts, without costs, the petition granted, and the matter remanded for further proceedings at which provision shall be made regarding liberal visitation and an allocation of travel costs.

ANDRIAS, J.P., FRIEDMAN, SWEENY and RICHTER, JJ., concur.

Order, Family Court, New York County (Ivy I. Cook, Ref.), entered on or about April 10, 2012, reversed, on the law and the facts, without costs, the petition granted, and the matter remanded for further proceedings at which provision shall be made regarding liberal visitation and an allocation of travel costs.