**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240557-U

Order filed April 28, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| CHRISTOPHER EBENEZER, | ) | Du Page County, Illinois. |
| | ) | |
| Petitioner-Counter Respondent- | ) | |
| Appellant/Cross-Appellee, | ) | Appeal Nos. 3-24-0557, |
| | ) | 3-24-0610 cons. |
| and | ) | Circuit No. 22-DC-626 |
| | ) | |
| JENNIFER EBENEZER, | ) | |
| | ) | The Honorable |
| Respondent-Counter Petitioner- | ) | James D. Orel, |
| Appellee/Cross-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ANDERSON delivered the judgment of the court.
Presiding Justice Brennan and Justice Hettel concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The trial court's rulings on relocation, parenting time, and allocation of payments and expenses were not against the manifest weight of the evidence nor an abuse of discretion. Trial court affirmed.

¶ 2    The parties were married in Du Page County in February 2018. They had two children who are now 6 and 4 years old. Christopher filed for dissolution in July 2022. Following trial, the circuit

court entered a written judgment of dissolution, reserving certain issues. After the circuit court resolved all remaining disputes, the parties filed separate appeals, which we consolidated.

¶ 3        Jennifer contests the denial of her request to relocate from Illinois to her hometown in Wisconsin. Christopher contests the allocation of parenting time, including the failure to designate parenting time for various Indian holidays, and the distribution of expenses for the marital home.

¶ 4                                          I. BACKGROUND

¶ 5        Jennifer was born and raised in Green Bay, Wisconsin, where her family resides. The parties met when Christopher worked there in 2016. She has a bachelor's degree from the University of Wisconsin Green Bay and worked at various jobs in Wisconsin. In August 2017, she followed Christopher to Aurora, Illinois, who had relocated there for work. The couple married in February 2018. Jennifer worked in Illinois while pregnant with their first child but stopped due to health issues in mid-2018. She has not had a job since then. Jennifer's health has remained an issue, affecting her ability to work and care for the children. She has had many different medical procedures, mostly in Wisconsin.

¶ 6        Christopher is a native of India who came to the United States in 2008 and is a permanent resident. He earns about $130,000 annually working in the IT field. He and his family own property in India but failed to list it on any financial affidavits he provided to the court.

¶ 7        In July 2022, Christopher filed for dissolution of marriage. On the evening Jennifer was served with the summons, she took both children to Green Bay. Christopher filed an emergency motion seeking their return. Jennifer responded that she went to Wisconsin for additional medical treatment and had no intention of permanently relocating at that time. The motion was placed on the regular court docket.

¶ 8	By August 2022, Jennifer still had not returned to Illinois. Christopher went back to court to request the children's return and parenting time. He alleged that Jennifer's continued presence in Wisconsin was not in the best interests of the children and that Jennifer had a reliance on opioids and other medication that detrimentally impacted her ability to meet the children's needs. He further alleged that the children had a poor support system in Wisconsin as Jennifer's parents had mobility and health concerns that made them unreliable childcare assistants.

¶ 9	Jennifer responded with a petition seeking temporary relocation to Wisconsin. She alleged that Christopher had done little in connection with the children's upbringing. She also alleged that she had additional relatives in Wisconsin who assisted with the children. She stated that she had undergone medical procedures in Green Bay since the spring of 2022, including surgery in June. She claimed that she needed further testing and treatment scheduled for September. She asked that the trial court consider the factors in the Illinois Marriage and Dissolution of Marriage Act (the Act) relating to the children's best interests in addressing her relocation request. 750 ILCS 5/609.2 (West 2022). In early November 2022, Jennifer filed a similar motion seeking permanent, rather than temporary, relocation to Wisconsin.

¶ 10	On November 9, an agreed order for parenting time was entered that included the parties' exchange of the children in Milwaukee. Christopher moved for the appointment of a guardian *ad litem* (GAL) and a professional evaluator under section 604.10(b) of the Act (750 ILCS 5/604.10(b) (West 2022)). Jennifer agreed to the appointment of a GAL but objected to the motion for an evaluator. The trial court appointed both a GAL, Thomas Kenny, and a section 604.10(b) evaluator, Dr. Gerald Blechman. In February 2023, Jennifer objected to Christopher's motion seeking to require her to find a job. In May, she filed two motions for rules to show cause for Christopher's failure to pay support.

3

¶ 11    In July 2023, Christopher filed a motion for the appointment of Dr. James Shapiro, a privately hired evaluator under section 604.10(c) of the Act to assist the court with parenting and other child-related issues. See 750 ILCS 5/604.10(c) (West 2022). He alleged that, due to Jennifer's delay tactics, he had been unable to obtain a report from either the GAL or Dr. Blechman. On July 24, Dr. Shapiro was appointed as an evaluator.

¶ 12    The parties resolved matters involving Christopher's payment obligations by agreement at a hearing held in November 2023. The circuit court's order on temporary parenting time was slightly extended for Christopher, and it added a requirement that each parent notify the other within 30 minutes of a child's injury or illness.

¶ 13    Jennifer filed another petition for a rule to show cause against Christopher in January 2024, alleging various failures to promptly notify her of a child's illnesses and attempts to falsify medical records. She also petitioned for sole allocation of decision-making for the children's health and education, contending that Christopher had engaged in conduct that attempted to portray her as an unfit parent and had exaggerated the children's medical conditions.

¶ 14    Also in January 2024, Christopher filed a motion to compel compliance with discovery requests because Jennifer failed to identify all her physicians, claiming instead that disclosure was not relevant. The motion alleged that Jennifer's excessive use of four specific anti-depressants and pain killers, as well as other unknown opioids, could adversely affect her ability to parent. On January 11, the court held a status hearing at which Jennifer was ordered to make four work applications per day, Christopher withdrew his motion to compel, and hearings on the pending petitions were continued.

¶ 15    Trial commenced on June 6, 2024. At trial, the GAL recommended granting Jennifer's request to relocate the children to Wisconsin. Although he admitted that the move would

negatively impact Christopher's relationship with the children, he testified that granting Christopher extended visitation could compensate. The GAL also recommended shared healthcare decision-making for the children, with Jennifer being primarily responsible for making appointments. He also opined that Jennifer would be able to obtain a job in Green Bay. Further, he testified that the children's educational opportunities in Green Bay and Du Page County were comparable. The GAL concluded that the statutory factors favored making Jennifer the primary custodian and recommended joint decision-making for their extracurricular activities and religion, with Jennifer having decision-making authority about healthcare and education.

¶ 16        The court's evaluator, Dr. Blechman, opined at trial that it would be best for Jennifer to reside in Wisconsin with the children because they seemed to be more bonded with her than with Christopher. Further, Jennifer's mental health improved when she was in Green Bay, where she received medical care. Dr. Blechman admitted, however, that it would be better for the children to live closer to Christopher and acknowledged the difficulty of fashioning a parenting time schedule after relocation. He found that both parents were active and had bonded with the children. He believed that the schools were comparable. Dr. Blechman noted that the presence of Jennifer's extended family in Wisconsin was a critical factor in his analysis.

¶ 17        In contrast, Dr. Shapiro testified that relocation was not in the children's best interests due to the problems created by the distance between the parents' residences. Dr. Shapiro believed it was more beneficial for the children to be closer to both their parents than to their extended family. Jennifer's family was still a factor, though, because she relied on third-party parenting support. While he expressed some concern about Jennifer's opioid use, Dr. Shapiro had no concerns about addiction.

5

¶ 18        The circuit court orally announced its decision on July 19, 2024, finding both parties credible and excellent parents. It also found both parents had bonded well with the children. The court emphasized that its duty was to make decisions focused on the children's best interests after considering all the statutory factors and the witnesses' credibility. The court noted that decisions on relocation and parenting time depended upon similar factors relating to the children's best interests. In addition, the court explained that it had reviewed and considered each relevant statutory factor but did not want his order to include redundant explanations for factors that affected multiple issues, apologizing for any redundancy. The focus of the trial court's explanation was the factors affecting Jennifer's relocation request.

¶ 19        Addressing the relocation request, the court stated that the round-trip drive to Green Bay for parenting time would be particularly hard on the children if that request were was granted. The court noted all the evaluators' testimony that Jennifer had serious health issues that affected her ability to both parent and find work.

¶ 20        In considering the statutory factors governing relocation, the court determined that the parents' difficulty in making significant decisions about the children had arisen not only due to the divorce but also due to the great distance between their residences. That distance would necessitate changes in the parties' prior agreed orders because the parenting time allocation would be impractical when the children started school. The distance between the two residences would be particularly problematic during the winter, when the drive would be slower and require the two young children to be in the car for much longer.

¶ 21        In considering the factors relating to the parents' wishes and the children's needs, the court found that each parent wanted the children to live in their respective state, and, correspondingly, the children needed both parents in their lives. The court found no evidence indicating that either

6

parent spoke negatively about the other and concluded that both parents were interested in the children's well-being.

¶ 22    The court concluded that Jennifer's move with the children constituted a substantial change in circumstances, and it was concerned by the timing and manner of her departure. The court noted that it was bound by statute to examine the circumstances and reasons for the relocation request, indicating that it had heard much testimony about why the children were taken to Wisconsin. The evidence showed that the parties were still living together and attending counseling when Christopher filed the dissolution action and that he did not direct the timing of the service of the summons. Jennifer testified as to her surprise when she was served with the summons after returning from a counseling session with Christopher. That same night, she took the children to Wisconsin, without any opportunity for a court hearing or the development of a record, despite the court then having jurisdiction over the matter.

¶ 23    The court next turned to the reasons why Christopher objected to the relocation, noting that the children were born and raised in Illinois and were living there when Jennifer suddenly moved them 3-1/2 hours away. The move necessarily undermined Christopher's ability to see his children on a regular basis. Both evaluators agreed that the distance would further impede the children's relationship with their father over time. More specifically, Christopher's midweek parenting time would have to end when school started due to the long drive for visitation if Jennifer's relocation request were granted.

¶ 24    Looking at the history and quality of each parent's relationship with the children, the trial court noted that both parties were good parents and had bonded and established loving relationships with the children. While both the GAL and Dr. Blechman testified that the children's educational opportunities in Illinois and Wisconsin were equivalent, Dr. Shapiro favored the

school in Woodridge, Illinois, due to its excellent reputation and greater cultural diversity, which he believed would be an advantage due to the children's multi-ethnic heritage. In reviewing the factor addressing the availability of extended family members, the trial court favored Wisconsin, where Jennifer's entire family resided. Only Christopher's mother lived near him in Illinois.

¶ 25    The circuit court concluded that a change in the father's ability to parent would negatively impact the children and gave great weight to the children's need for both parents. The court next cited the effect of the move on the reasonable allocation of parental responsibilities, noting that Christopher would be limited to visitation every other weekend if relocation were allowed. The court believed that it would not be healthy for the children to see less and less of their father over time.

¶ 26    Due to children's young age, the circuit court declined to consider their views on relocation or the allocation of parenting time. The witnesses expressed disagreement about the impact that a change in parenting time would have on the children. The evidence showed that the father would be limited to just 48 hours of time with the children every other week if Jennifer relocated. In concluding that the greater distance would adversely impact the children's development, Doctor Shapiro referenced studies indicating that parent-child relationships were still forming at this stage of development. The court expressed concern with the effect that Jennifer's health condition, and possible deterioration over time, would have on her ability to parent, potentially requiring her parents to raise the children in Wisconsin.

¶ 27    The court also considered the high level of debt that the parties had incurred during the dissolution and relocation proceedings. The court estimated their combined debt to be between $200,000 and $300,000. The need for income to pay off that mountain of debt would likely further

8

impair Christopher's relationship with the children if relocation were granted because his travel time would undermine his earning potential.

¶ 28        In reviewing Jennifer's health and future employment, the court reasoned that Chicago and Du Page County had advantages over Green Bay for both medical care and job opportunities. The trial court's oral ruling noted that the court in *In Re the Marriage of Mehta,* 2024 IL App (3d) 240055-U, issued just 3 weeks earlier, had held that a hearing was mandatory prior to any relocation attempt. Here, the judge noted that Jennifer's sudden removal of the children to Wisconsin precluded such a hearing. After considering all the statutory factors and other relevant evidence, the court denied Jennifer's request for relocation.

¶ 29        The court ordered Jennifer to move back to Illinois with the children before school began. She was permitted to live in the marital home with the children for one year, at which time the house would be listed for sale. Christopher was ordered to pay 80% of the house expenses during that year, and Jennifer was ordered to pay 20%, plus utilities. If the sale of the marital home resulted in a surplus, Christopher would receive the first $62,000 to reimburse him for the non-marital funds he had contributed to the original purchase of the house. Christopher was also awarded parenting time, and the parties were awarded joint parenting responsibility for decisions involving the children. Christopher appealed, and Jennifer cross-appealed. The two appeals were subsequently consolidated.

¶ 30                                        II. ANALYSIS

¶ 31        The trial court's orders allocating parenting time, parental decision making, and payment of expenses largely flow from its relocation decision. For example, if relocation were allowed, Christopher's allocation of parenting time would be disproportionately affected because he would face a seven-hour roundtrip drive to see his children. Hence, we start our analysis with the trial

court's decision to deny Jennifer's request to relocate with the children from Woodridge, Illinois, to Green Bay, Wisconsin.

¶ 32                                    A. Jennifer's Relocation Request

¶ 33        The standard of review for order on a request to relocate requires us to consider whether the order was against the manifest weight of the evidence. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re V.S.*, 2025 IL 129755, ¶ 52. The paramount consideration in deciding a relocation request is the best interests of the children. *Fatkin*, 2019 IL 123602, ¶ 32. That determination cannot be reduced to a simple bright-line test and, instead, must be made on a case-by-case basis. *Id*. " '[A] trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred.' " *Id*. (quoting *In re Marriage of Eckert,* 119 Ill. 2d 316, 328 (1988)). Deference to the trial court's determination is appropriate because, as the trier of fact, it had "a significant opportunity to observe the parents," and here, to a lesser extent, the children. Under those circumstances, a presumption favoring the trial court's determination "is always strong and compelling." *Id.*

¶ 34        On review, we cannot reweigh the competing factors. *In re P.D.,* 2017 IL App (2d) 170355, ¶ 19. Because of the unique analysis required, a trial court's relocation decision cannot simply be based on a "tally" of which of the eleven factors in section 609.2 of the Act favored each party. *In re Marriage of Levites,* 2021 IL App (2d) 200552, ¶ 71. The decision in each relocation case must be based on its unique facts, making comparisons with decisions arising under different sets of facts of limited value. *Kimberly R. v. George S.,* 2021 IL App (1st) 201405, ¶ 74.

¶ 35    The party seeking to relocate bears the burden of proof. *In re Marriage of Prusak,* 2020 IL App (3d) 190688, ¶ 38. Pursuant to our supreme court's ruling in *In re Marriage of Fatkin*, 2019 IL 123602, trial court's determination of the child's best interests in the context of a relocation question should not be disturbed unless it is " 'clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred.' " *Id.* ¶ 32. Here, the same judge presided over this matter for the five days of trial and at least the eleven preceding months. He heard and ruled on numerous motions and had multiple opportunities to observe both parties before finding them to be credible and good parents. The relocation order in this case fits squarely within the rationale underlying a reviewing court's deference to a trial court's determination.

¶ 36    The legislature has established a statutory framework for ruling on a request for parental relocation. 750 ILCS 5/609.2 (West 2022). In a contested relocation, subsection (g) mandates that the court modify the parenting plan in accord with the child's best interests after considering eleven factors:

> "(1) the circumstances and reasons for the intended relocation; (2) the reasons, if any, why a parent is objecting to the intended relocation; (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment; (4) the educational opportunities for the child at the existing location and at the proposed new location; (5) the presence or absence of extended family at the existing location and at the proposed new location; (6) the anticipated impact of the relocation on the child; (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs; (8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and

11

independent preferences as to relocation; (9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child; (10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and (11) any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g) (West 2022).

¶ 37     On appeal, Jennifer specifically contests the court's determination on a few of those factors. Regarding the third factor, addressing the history and quality of each party's relationship with the children, the court found that both Christopher and Jennifer had a good and loving relationship with the children. Jennifer claims that that finding was in error because it failed to recognize that, before she left for Wisconsin, Christopher had comparatively little contact with the children while he was working. We are not persuaded by that argument. Although Jennifer was not employed and, thus, was able to at home more, the witnesses and the trial court determined that Christopher had developed a good relationship with the children.

¶ 38     Jennifer next argues that the court should have given more weight to the availability of her extended family in Wisconsin. The court recognized that Christopher lacked much extended family in Illinois but explained that the best interests of the children depended more on the quality of the relationship with each parent rather than on their relationships with either parent's extended family. We have no valid basis to reweigh the circuit court's analysis of these factors.

¶ 39     Jennifer also disputes the weight given by the trial court to its reduced ability to fashion a reasonable allocation of parental responsibilities if relocation occurs. Although the court said little about this factor, it did reiterate its belief that the increased driving time required for Christopher to exercise his parenting time would adversely impact his relationship with the young children and would not be healthy for them.

12

¶ 40    In challenging the trial court's consideration of the relevant catch-all factors considered by the court, Jennifer points out that both Kenny and Blechman favored relocation, while only Shapiro, the hired evaluator, recommended denial of her request. She also points out that the parties and the children had close ties in Wisconsin and that the children seemed to have adjusted well there. That conclusion arises, however, only because Jennifer improperly took the two children to Wisconsin without making a request in the trial court or affording Christopher an opportunity to be heard. A parent should not be allowed to benefit from such a preemptive decision when they fail to show that relocation is in the best interests of both the parent and the children. *Prusak*, 2020 IL App (3d) 190688, ¶ 39. The trial judge was in the best position to consider and weigh these factors, and we see no justifiable basis to reject his conclusions.

¶ 41    Section 609.2 of the Act became law on January 1, 2016. 750 ILCS 5/609.2 (West 2022). Of the 15 or so cases Jennifer discussed regarding relocation, only one, *Burmood v. Anderson,* 2023 IL App (2d) 230092, was decided since the Act became the law of this state. There, the mother petitioned to relocate from Naperville to Galesburg, Illinois, to enhance her financial condition because the cost of living was markedly lower in Galesburg and family members were available to help with childcare. She also alleged that the father was in substantial arrears of court-ordered child support. The father objected to the relocation, claiming that he would lose his weekday time with the child. The trial court denied the mother's relocation request, finding that it was not in the child's best interest. The appellate court reversed, finding that the denial was against the manifest weight of the evidence, after reviewing the trial court's analysis of specific statutory factors. *Burmood,* 2023 IL App (2d) 230092, ¶ 66. The reviewing court believed that the trial court's finding that the financial reasons supporting relocation were only minimally persuasive was "perplexing." *Id.* ¶ 31. In reviewing the rationale underlying the father's objection, the court

concluded that the circuit court's reliance on the father's claims that his future relationship with the child would be impacted was against the manifest weight of the evidence. The evidence established that the father had a history of seeing the child only once per week, and the court found that his claimed desire to coach the child in sports as he grew up was both pretextual and speculative.

¶ 42 Further, the father in *Burmood* was in arrears in child support and had offered untruthful testimony about his income to minimize his support obligation. Concluding that those attempts to minimize his support obligation undermined any claim of a good relationship with the child and weighed against the father's objections, the court found the trial judge had improperly considered those factors. *Burmood,* 2023 IL App (2d) 230092, ¶ 43. The evidence showed the father's relationship with the child was weak and did not support his objection to the relocation request. In addition, the circuit court failed to make any findings regarding the educational opportunities and the presence of extended family in the two areas, factors that the appellate court found favored relocation. The factors relating to the impact of the move on the child and the availability of a reasonable allocation and exercise of parental responsibilities also weighed in favor of relocation.

¶ 43 Our supreme court instructs that each relocation request must be viewed on a case-by-case basis. *Fatkin,* 2019 IL 123602, ¶ 32. Here, unlike in *Burmood* and the other cases cited by Jennifer, the trial court discussed the evidence in relation to each of the factors in section 609.2(g). The court repeatedly stated that its decision was rooted in the best interests of the children. The only benefit to the children from the move alleged by Jennifer was the presence of her extended family in Green Bay. After carefully reviewing the evidence and the trial court's ruling, we find that the denial of Jennifer's relocation request was not against the manifest weight of the evidence.

¶ 44 B. Christopher's Parenting Time Allocation

14

¶ 45    Christopher argues that he should have been awarded 50% of the children's parenting time. The standard of review for an allocation of parenting time is whether the decision was against the manifest weight of the evidence. *Levites*, 2021 IL App (2d) 200552, ¶ 69. Section 602.7 of the Act sets out 17 factors to be used in determining the best interests of the child when setting a parenting time order. 750 ILCS 5/602.7 (West 2022). Those factors are:

> "(1) the wishes of each parent seeking parenting time; (2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time; (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth; (4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child; (5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests; (6) the child's adjustment to his or her home, school, and community; (7) the mental and physical health of all individuals involved; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household; (12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs; (13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the

15

occurrence of abuse against the child or other member of the child's household; (15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15); (16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and (17) any other factor that the court expressly finds to be relevant."

¶ 46     A court is not required to make explicit findings on each of the 17 factors. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43. It is sufficient if the court has reviewed and considered those factors. *Id*. Here, the trial court stated that it had considered each of the relevant factors. Its oral ruling excluded the second factor (the wishes of the children) and the sixth factor (their adjustment to the new home, school, and community), and most of the relevant factors were discussed without any specific statutory references. The trial court also discounted the last several factors, addressing abuse, sex offenses, and military service, as no evidence was presented on them. The court's reasoning centered on the good relationship the children had with both parents and the fact that, despite the children being taken to Wisconsin without any authorization, the evaluators all found that they continued to have a loving bond with both parents.

¶ 47     Christopher was awarded about 35% of the available parenting time. His work takes him outside the home regularly. He was awarded parenting time every other weekend from Friday after school until Monday morning, with two overnight stays on the off weeks. The trial court did not make any special provision for extra parenting time on traditional Indian holidays, leaving the parties to make those adjustments.

16

¶ 48    Christopher alleges that the court erred by failing to grant parenting time for Indian holidays. The court adopted the GAL's recommendation on holiday visitation from July, 2023 as part of its award of parenting time which omitted any mention of specific time for Indian holidays. In *In re Marriage of Bastian*, 2023 IL App (3d) 220163-U, the court made clear that the trial court considered the best interests of the children in denying the father's request for modification of parenting time to give him federal holidays. Justification was found in considering that federal holidays can change and may not correspond with days off school. Similarly here, no specific Indian holidays were requested by Christopher and concerns about conflicts with school or the children's other activities are valid. Also, adding additional holiday parenting time would unnecessarily add confusion and possible conflict with other awarded time if the days occasionally fell on Jennifer's holiday time.

¶ 49    After carefully reviewing the evidence in the record, we can identify no reversible error in the trial court's allocation of parenting time. We cannot conclude that the opposite conclusion is clearly evident.

¶ 50                          C. Payment of Marital Home Expenses

¶ 51    As the trial court explained, Jennifer and the children were awarded exclusive residence in the marital home for one year because she had no other place to live, had no job and no car. Christopher was ordered to pay 80% of the house expenses because he had a good job. He claims, however, that the court erred, arguing that his income is inadequate to justify the award due to his debt, child support obligations, and personal expenses. He asserts that the order is tantamount to an award of spousal maintenance despite the parties' agreement to waive maintenance.

¶ 52    In reviewing an order to pay expenses, the proper test is whether the order was an abuse of the trial court's discretion. *In re Marriage of Ash and Matschke*, 2021 IL App (1st) 200901, ¶ 48.

An abuse of discretion occurs when a decision is clearly contrary to logic, is arbitrary and lacking in conscientious judgment, or exceeds the bounds of reason and ignores established principles of law when viewed in light of all the circumstances, resulting in substantial prejudice. *People v. Gray*, 378 Ill. App. 3d 701 (2008).

¶ 53        Christopher's financial affidavit indicates that his net income is $8,683 per month. He pays $1,983 per month in child support. Barring any extraordinary events, his 80% share of the house expenses will be about $1,640. Applying simple math, that leaves him with $5,060.00 for other expenses. Although the total sum owed by the parties in connection with this dissolution is large and inexact, we cannot say that the trial court's expense allocation was outside the bounds of reason. Additionally, we note that the court awarded Christopher the first $62,000 of any profits from the sale of the house. Under the facts of this case, the court's expense allocation was not an abuse of its sound discretion.

¶ 54                                   III. CONCLUSION

¶ 55        For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 56        Affirmed.